## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SHANGHAI DAISY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 5901 |
| v. | ) | |
| | ) | |
| POSITIVENERGY, INC., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant PositivEnergy, Inc.'s ("PositivEnergy's") motion to dismiss plaintiff Shanghai Daisy, LLC's ("Shanghai Daisy's") action against it for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). R. 23. For the following reasons, that motion is granted.

### STANDARD

"A complaint need not include facts alleging personal jurisdiction. However, once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When the court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Id.* The court reads "the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff to determine whether it has done so. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d

870, 877-78 (7th Cir. 2006). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783. "[T]he plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." *Id.*

BACKGROUND

This case arises out of a business agreement between Illinois-based Shanghai Daisy and Denmark company Luxole Aps ("Luxole") and the cessation of payments to Shanghai Daisy thereunder when Luxole's representative disappeared.

*Complaint.* According to the complaint, Shanghai Daisy—a large distributor of citronella candles, torches and accessories—entered into an Investment and Profit-Sharing Agreement (the "Agreement") with Luxole and "its affiliates and subsidiaries" on June 27, 2017. R. 2 ¶¶ 2, 8. The Agreement, which is attached to the complaint and does not define "affiliate" or "subsidiary," obligates Shanghai Daisy to invest in Luxole to aid it in expanding its distribution of liquid candles, lamp oil, and other products (the "Products") in exchange for ongoing sales commissions and other compensation (the amount and schedule for which is not important here). *Id.* ¶ 9. Shanghai Daisy agreed to make its investment via wire transfer in three installment payments of $300,000 upon the Agreement's execution, $150,000 by October 15, 2017, and $50,000 by January 18, 2018, with the latter two payments coming due only if Luxole had timely paid commissions to Shanghai Daisy under the Agreement. *Id.* ¶ 10. The Agreement also contains a forum selection clause, stating:

2

> Each party hereto consents to the jurisdiction of any state or federal court located within Cook County, Illinois and irrevocably agrees that, for all actions or proceedings arising out of or relating to this agreement or the transactions contemplated hereby shall be litigated exclusively in such courts. Each party hereto accepts for itself and in connection with its properties, generally and unconditionally, the jurisdiction of the aforesaid courts.

R. 2 at 16.

Shortly after executing the Agreement, Luxole directed Shanghai Daisy to wire the investment installments to Florida-based PositivEnergy, on the representation that PositivEnergy was Luxole's United States entity, affiliate and agent. *Id.* ¶¶ 3, 16-17. Shanghai Daisy wired the first installment of $300,000 to PositivEnergy on June 30, 2017. It then wired a second payment of $107,257.89 on October 13, 2017, which represented the $150,000 installment set forth in the Agreement less the $42,742.11 in commissions Shanghai Daisy was owed but not paid for the third quarter of 2017. *Id.* ¶¶ 16, 18. Because Shanghai Daisy also did not receive the $49,176.17 in fourth quarter commissions it was owed, it did not pay PositivEnergy the third installment of $50,000 in January 2018 as contemplated under the Agreement. *Id.* ¶ 19. Instead, the $823.83 in investment money that Shanghai Daisy still owed was deducted from the first quarter 2018 commissions PositivEnergy wired to Shanghai Daisy, resulting in a first quarter 2018 commission payment of $48,271.13. *Id.* ¶¶ 19-20.

Shanghai Daisy learned in November 2018 that Luxole may have filed for bankruptcy in October 2017. *Id.* ¶ 22. It has not received any other commission

payments from PositivEnergy or Luxole, and in all, has net funded PositivEnergy $358,986.76. *Id.*

Shanghai Daisy asserts four claims against PositivEnergy arising out of missed commission payments under the Agreement: breach of contract (Count I); unjust enrichment (Count II); money had and received (Count III); and fraudulent concealment of Luxole's bankruptcy (Count IV). *See generally id.*

***PositivEnergy's jurisdictional evidence.*** In support of its motion to dismiss, PositivEnergy's principal agent and sole owner, Michael Bolanos, submitted an affidavit in which he attests that he formed PositivEnergy in 2017 for the purpose of creating, marketing and selling candles, but that PositivEnergy has not advertised or solicited business in Illinois; placed any products into the stream of commerce or otherwise engaged in any commercial activities; or progressed past the incorporation stage ("Bolanos Affidavit"). R. 21, Ex. C ¶¶ 1-6. Mr. Bolanos further represents that PositivEnergy is not Luxole's affiliate or subsidiary, is not a party to and was not involved in drafting or executing the Agreement, and has not entered into any contractual agreement with Luxole. *Id.* ¶¶ 7-8. Mr. Bolanos also asserts that PositivEnergy did not communicate with Shanghai Daisy until "several years" after the Agreement was executed; did not "contract or promise to perform part of a contract connected with the State of Illinois;" and never "entered into a contract with any party regarding the sale of candles" or "promised to perform part of a contract on behalf of [Shanghai Daisy], Luxole, or any other entity." *Id.* ¶¶ 7, 9.

Along with its reply brief, PositivEnergy also submitted a June 10, 2019 email from Mr. Bolanos to Shanghai Daisy president John R. ("Jack") Murphy and Shanghai Daisy's counsel indicating (among other things) that PositivEnergy received funds from Shanghai Daisy and sent them to Luxole and its suppliers at Luxole's direction, but that PositivEnergy and Luxole had no interest or stake in one another, and PositivEnergy was not Luxole's affiliate or subsidary. R. 31, Ex. B. Mr. Bolanos wrote that he "counted on" Luxole agent Mr. Moller, but "Luxole never came through with product or a way to move the project forward," and "[t]he PositivEnergy account has been dormant with no funds for well over a year." *Id.*

***Shanghai Daisy's jurisdictional evidence.*** In response to PostivEnergy's motion, Shanghai Daisy's president Mr. Murphy submitted his own affidavit representing that after he executed the Agreement on June 27, 2017, Luxole agent Mr. Moller instructed him by email to wire the investment installment payments to its U.S. entity PositivEnergy, and provided PositivEnergy's routing number for that purpose ("Murphy Affidavit"). R. 28 ¶ 4. In the same email thread, Mr. Moller clarified that the account's "beneficiary is Luxole, but our US entity is PositivEnergy, Inc. So the name of the account is PositivEnergy, Inc." *Id.* Mr. Murphy attached the email correspondence, and explained that he was not aware of PositivEnergy prior to the exchange. *Id.* ¶ 5 and Ex. C.

Thereafter, Mr. Murphy attests that he coordinated the reduced amount of Shanghai Daisy's second investment installment, the decision not to make the third installment, and the amount of the 2018 first quarter commission payment with Mr.

Moller, but that the wire transfers—that is, both investment installment payments and one commission payment—were to and from PositivEnergy. *Id.* ¶¶ 7-9, 17.

But Mr. Murphy also attests that he was not familiar with Mr. Bolanos until January 2019. *Id.* ¶ 10. According to Mr. Murphy, on January 9, 2019, while in Illinois, he had a telephone call with Mr. Bolanos, who was in Florida, to discuss Mr. Moller's whereabouts. *Id.* ¶ 11. Mr. Murphy attests that Mr. Bolanos told him during that call that he attended a May 2018 restaurant trade show in Chicago with Mr. Moller and asked Mr. Moller at that time why they weren't meeting with Mr. Murphy since Mr. Bolanos knew he lived in Chicago and Shanghai Daisy had funded PositivEnergy. *Id.* ¶ 12. Mr. Murphy also represents that Mr. Bolanos "acknowledged receipt of the [investment] payments" and told Mr. Murphy that his accountant had recommended that he list them as a loan. *Id.* ¶ 13.

According to Mr. Murphy, he and Mr. Bolanos exchanged text messages several days later concerning attempts to contact Mr. Moller to resolve issues related to the investment payments Shanghai Daisy made to PositivEnergy. *Id.* ¶ 14. Ultimately, Shanghai Daisy sent PositivEnergy a demand letter concerning the missed commission payments. *Id.* ¶ 15. Mr. Murphy further represents that prior to sending the June 10 email response outlined above, Mr. Bolanos left him a voicemail suggesting that due to Mr. Moller's disappearance, PositivEnergy had gone dormant and lacked the funds to pay the commissions. *Id.* Apparently unable to locate Mr. Moller or any other Luxole representative, this lawsuit against PositivEnergy followed.

6

## ANALYSIS

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden*, 571 U.S. at 283 (quoting *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). The Illinois long-arm statute requires nothing more than the standard for federal due process: that the defendant have sufficient contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). As such, personal jurisdiction can arise by way of: (1) "general jurisdiction (*i.e.*, continuous and systematic contacts with Illinois)"; (2) "specific jurisdiction (*i.e.*, sufficient minimum purposeful contacts with Illinois and the dispute arose out of those contacts)"; or (3) waiver, including when the agreement out of which a dispute arises contains a forum selection clause and the defendant is either party to that agreement or "so closely related to the dispute" that it is "bound by the forum selection clause" even though it did not sign the agreement. *Solargenix Energy, LLC v. Acciona, S.A.*, 17 N.E.3d 171, 182 (Ill. App. Ct. 2014); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) ("because the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court," including based on a freely negotiated forum selection clause).

Shanghai Daisy does not assert that the Court has general jurisdiction over PositivEnergy, but rather that PositivEnergy is subject to the Agreement's forum

7

selection clause through which it waived the right to contest this Court's jurisdiction, and that the Court has specific jurisdiction over its claims. The Court addresses certain evidentiary issues before turning to the parties' jurisdictional arguments.

## I.    Evidentiary Issues

PositivEnergy contends that the Murphy Affidavit should be stricken because many of its paragraphs contain hearsay, conclusory allegations without supporting evidence, and legal conclusions in violation of Rule 56(e). R. 30 at 4. As an initial matter, it is unclear whether an affidavit submitted in support of a Rule 12(b)(2) motion need comply with Rule 56(e). *See Rodriguez v. City of Milwaukee*, 1995 WL 704760, at *3 (N.D. Ill. Nov. 29, 1995) (declining to hold plaintiff's affidavit in opposition to Rule 12(b)(2) motion to the standards set forth in Rule 56(e) because "Rule 56(e) does not apply"); *see also Contrak, Inc. v. Paramount Enterprises Int'l, Inc.*, 201 F. Supp. 2d 846, 850-51 (N.D. Ill. 2002) (noting that "[s]everal courts have suggested that affidavits submitted in response to a motion to dismiss under Rule 12(b)(2) must be based on personal knowledge or comply with Rule 56(e), . . . but the Seventh Circuit has not addressed this issue"). And at least one court in this District has held that on a Rule 12(b)(2) motion, a court "need only address the admissibility of [statements in a plaintiff's affidavit] to the extent they are controverted by evidence submitted by Defendants." *See Receivership Mgmt. v. AEU Holdings, LLC*, 2019 WL 4189466, at *6 (N.D. Ill. Sep. 4, 2019).

Here, the Court can find no legal conclusions in the Murphy Affidavit. Further, the Court presumes that as Shanghai Daisy's president, Mr. Murphy has personal

knowledge of many of the underlying facts. But the Murphy Affidavit does reflect several out-of-court statements and conversations, including:

- Emails between Mr. Murphy and Mr. Moller in which Mr. Moller indicated that investment installments should be sent to PositivEnergy, Luxole's "U.S. entity;"

- The conversation between Mr. Bolanos and Mr. Moller at a May 2018 Chicago trade show that Mr. Murphy attests Mr. Bolanos relayed to him and reflecting Mr. Bolanos's understanding that Shanghai Daisy "funded" PositivEnergy;

- Mr. Bolanos's alleged acknowledgment to Mr. Murphy during the same January 2019 phone call that PositivEnergy had received the installment payments and that his accountant advised him to treat them as a loan;

- Mr. Murphy telling Mr. Bolanos during the same phone call that Mr. Moller had directed him to send the investment installments to PositivEnergy as Luxole's U.S. entity;

- Mr. Murphy and Mr. Bolanos's text exchange later in January 2019 concerning Mr. Moller's whereabouts and issues concerning payments to PositivEnergy under the Agreement; and

- The June 2019 voice message Mr. Murphy contends Mr. Bolanos left him in response to Shanghai Daisy's demand letter, in which he purportedly indicated that PositivEnergy lacked funds because of Mr. Moller's disappearance.

Nevertheless, the admissibility of these statements does not impact the resolution of this motion. And even considering them and the parties' other evidentiary submissions, three things become clear. First, while the relationship between PositivEnergy and Luxole is murky at best, Shanghai Daisy offers nothing to indicate any formal legal relationship or agreement between them, and the Bolanos Affidavit establishes that there was not. The Court thus presumes that the two entities are not so related. *See GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009) (on a Rule 12(b)(2) motion, the court accepts as true "any facts contained in the defendant's affidavits that remain unrefuted by the

plaintiff"). Second, Shanghai Daisy makes no attempt to refute Mr. Bolanos's representation that PositivEnergy has not advanced past the incorporation stage, let alone advertised its products or placed any into the stream of commerce (in Illinois or otherwise).

But on the other hand, nor has PositivEnergy demonstrated that it did not receive the investment installment payments from, or send a commission payment to, Shanghai Daisy. To the contrary, PositivEnergy acknowledges receiving the wire transfers and sending money to Luxole and its suppliers in Denmark in the June 10, 2019 email from Mr. Bolanos it submitted.[1] With this in mind, the Court turns to the jurisdictional arguments.

## II.     Personal Jurisdiction

### A.     Forum Selection Clause and the "Closely Related" doctrine

Shanghai Daisy first contends that jurisdiction is proper because PositivEnergy waived the right to contest it via the Agreement's forum selection clause. Under Illinois law, "forum selection clauses are presumed valid and enforceable, unless proven otherwise by the party contesting their application," and "have been held to apply not merely to contract claims involving the terms of the contract in which the clause appears, but also to other claims . . . connected to the

---

[1] PositivEnergy makes much of the fact that Shanghai Daisy offers no "documentary evidence" of the transactions referred to in the complaint and Murphy Affidavit. But because as noted PositivEnergy does not refute that those transactions occurred, no such evidence is required.

contract, such as tort claims arising from the contract." *Solargenix Energy, LLC v. Acciona, S.A.*, 17 N.E.3d 171, 182 (Ill. App. Ct. 2014).

Citing the Illinois Appellate Court in *Solargenix*, Shanghai Daisy points out that courts have enforced forum selection clauses against non-signatories to the agreements where the non-signatories were deemed "closely related" to the dispute and parties such that it was "foreseeable" that they would be bound. *Id.* at 185 ("[w]here there is a sufficiently close relationship between the non-signatory and the dispute and the parties, it does not defy the non-signatory's reasonable expectations that it would be bound by the [forum selection] clause, just as the signatory parties are."). Shanghai Daisy contends that the Court should do so as to PositivEnergy here, because it made and accepted payments under the Agreement and thus was "closely related" thereto.

But this Court previously questioned whether such a "closely related"/"foreseeability" analysis is appropriate in the personal jurisdiction context, absent minimum contacts with the jurisdiction to address due process concerns. *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 926 (N.D. Ill. 2017) (reflecting this Court's "serious concerns" over whether it would be reasonable and just to apply such a test "to find implied consent to personal jurisdiction," including because under *Walden v. Fiore*, 571 U.S. 277 (2014), "due process considerations are not tied to 'foreseeability' alone," and a waiver must reflect a "conscious relinquishment of a known right") (quoting *Anderson v. Catholic Bishop of Chi.*, 759 F.3d 645, 651 (7th Cir. 2014)). Indeed, the Seventh Circuit has applied the doctrine to bind non-

signatories to a forum selection clause only in the venue context. *See Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436 (7th Cir. 2012). And even then, the *Adams* court acknowledged that the doctrine was "vague," deconstructing it into the "reasonably precise" principles of "affiliation" and "mutuality," either of which allow a non-signatory to invoke or be bound by a forum selection clause.[2] 702 F.3d at 439. "Affiliation" applies when a forum selection clause is enforced "by or against a company that is under common ownership (for example as a parent or subsidiary) with . . . a party to a contract containing the clause." *Id.* at 439-40. And the principle of "mutuality" allows a party who is not a signatory to the agreement containing a forum selection clause to enforce the clause in the same situations the opposing party (and signatory) is allowed to invoke it. *Id.* 442-43.

Shanghai Daisy does not argue either principle here. And there is no evidence of a formal legal relationship between PositivEnergy and Luxole (as was the case in *Solargenix* and *Adams*) or any other agreement or understanding between them, and

---

[2] The Seventh Circuit has also recognized the appropriateness of binding a third-party beneficiary to an agreement's forum selection clause in the venue context via the "closely related"/"foreseeability" framework. *See Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 210 n.7 (7th Cir. 1993). But the Seventh Circuit distinguishes between direct beneficiaries and incidental third-party beneficiaries. Indeed, "only a direct third-party beneficiary may enforce [a] contract because the contracting parties intended for the beneficiary to receive the benefits of the contract," and whether a party is a direct or an incidental third-party beneficiary turns on the intent of and "understandings between the parties at the time of the contract's execution." *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 930 (7th Cir. 2003). Here, Shanghai Daisy was not even aware of PositivEnergy when it signed the Agreement. So any contention that PositivEnergy is bound by the forum selection clause as a third-party beneficiary fails, even assuming PositivEnergy benefitted from the Agreement in the first place (which it denies), and setting aside the Court's constitutional concerns.

nor is there evidence that PositivEnergy was involved in any way in negotiating the Agreement. The Court thus doubts that the "closely related" doctrine would subject PositivEnergy to the forum selection clause even for venue purposes, let alone permit a waiver of personal jurisdiction absent sufficient minimum contacts with Illinois.[3] *See Guaranteed Rate, Inc.*, 264 F. Supp. 3d at 927-28 ("Recognizing the possibility that certain types of formal legal relationships . . . may sufficiently satisfy due process considerations to hold the non-contracting party bound as a matter of law by the express waiver of the contracting party, it is enough to say that this case involves no such formal legal relationship."). The Court thus declines to find personal jurisdiction on the basis of the forum selection clause alone.

### B.    Specific Jurisdiction and Minimum Contacts

Nor are there sufficient contacts between PositivEnergy and Illinois to support specific jurisdiction. Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). It is appropriate where "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business

---

[3] The Court notes that the Seventh Circuit in *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians* expressly indicated that the concept of "affiliation" and "mutuality" may not be as narrow as described in *Adams*, and that those "situations simply represent[ed] the factual scenarios in which we have been called upon to apply" them. 807 F.3d 184, 212 (7th Cir. 2015). The court went on to hold that the non-signatory party in that case could invoke the forum selection clause in the relevant agreement because he was "intimately involved in the negotiations leading to, and the documents embodying" the issue in dispute and containing the forum selection clause. *Id.* at 213. But *Stifel* is inapposite because it did not concern personal jurisdiction, and the evidence indicates that neither PositivEnergy nor its agents were involved in drafting or negotiating the Agreement.

in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (internal quotation marks and citations omitted). In analyzing whether personal jurisdiction exists, the proper question "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290. Further, those contacts must be "with the forum State itself, not . . . with persons who reside there." *Id.* at 285. As such, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 286.

Here, Shanghai Daisy's claims against PositivEnergy relate to payments sent and received pursuant to the Agreement. While those payments apparently were sent between Shanghai Daisy (in Illinois) and PositivEnergy (in Florida), the problem for Shanghai Daisy is that its argument for specific jurisdiction is premised on the idea that PositivEnergy is party to or otherwise subject to the Agreement. An "individual's contract with an out-of-state party" cannot, on its own, "establish sufficient minimum contacts in the other party's home forum." *Burger King*, 471 U.S. at 478. Nor is "wiring payments from a nonresident to a resident, pursuant to a contract" enough. *RSK Enters., LLC v. Comcast Spectacor, L.P.*, 2018 WL 319318, \*4 (N.D. Ill. Jan. 8, 2018) (citing *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 395 (7th Cir. 1994) and *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596, 604 (7th Cir. 1979)).

Instead, a court analyzing whether minimum contacts exist to support jurisdiction over a contract dispute considers: "(1) whether the contract was negotiated or executed in Illinois and whether it was to be performed in Illinois; (2) whether payment was to be made in Illinois; (3) whether the defendant was ever physically present in Illinois in connection with the contract; (4) whether the Illinois plaintiff or the out of state defendant initiated the transaction; (5) and the occurrence of telephone calls or other communications to and from Illinois." *AS Engine Leasing, LLC v. Vision Airlines, Inc.*, 2014 WL 6461760, at *3 (N.D. Ill. Nov. 18, 2014); *see also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.,* 536 F.3d 757, 761 (7th Cir. 2008).

Here, there is no evidence that PositivEnergy played any role in negotiating or accepting the terms of the Agreement, let alone that it initiated or executed it. In fact, Mr. Murphy attests that he was not even aware of PositivEnergy before he signed the Agreement on behalf of Shanghai Daisy, and Mr. Bolanos attests that the first time he communicated with Mr. Murphy was about a year and half after the Agreement was executed. Further, there is nothing to indicate that Mr. Bolanos's sole physical appearance in Illinois for a 2018 restaurant convention was connected to the Agreement. And while the parties' agents did engage in communications across state lines, those communications commenced only after (and because) payments to Shanghai Daisy ceased, and Mr. Moller was unreachable. Finally, even assuming that PositivEnergy benefitted from Shanghai Daisy's payments (instead of merely passing them along to Luxole and its distributors as PositivEnergy contends, and the evidence of its inoperative business suggests), simply receiving investment payments

15

from an entity based in Illinois does little to connect it to Illinois as a forum. *See Citadel Grp. Ltd.*, 536 F.3d at 763 ("making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction"). And as discussed a connection to a forum state's resident is not enough. *See Walden*, 571 U.S. at 285 (contacts to support jurisdiction must be "with the forum State itself, not . . . persons who reside there").

Accordingly, Shanghai Daisy has not met its burden to demonstrate that PositivEnergy—which is not a party to the Agreement and is not operational—has sufficient minimum contacts with Illinois, and this Court cannot find jurisdiction.

## CONCLUSION

For the foregoing reasons, PositivEnergy's motion to dismiss for lack of personal jurisdiction, R. 23, is granted. Civil case terminated.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: July 30, 2020

16